# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with the accounts identified as<br>Four Gmail Accounts that are within the possession,<br>custody, or control of Google, LLC | ) ) ) ) ) |

Case No. **2:23-MJ-04564**

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☒ Evidence of a crime;
☒ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Threat by Interstate Communication |
| 18 U.S.C. § 2261A | Stalking |
| 18 U.S.C. § 922(g) | Prohibited Person with a Firearm |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

*/s/ Jacob Tomes*
_____
*Applicant's signature*

Jacob Tomes, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State:    Los Angeles, CA
_____
*Judge's signature*

Margo A. Rocconi, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Alix McKenna (x6166)

## <u>ATTACHMENT A</u>

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the SUBJECT ACCOUNTS identified as:

a.  The email account identified as jlipman52@gmail.com ("SUBJECT ACCOUNT 1");

b.  The email account identified as ocjudgesarecapitalistliars@gmail.com ("SUBJECT ACCOUNT 2");

c.  The email account identified as laceyviolatesconstitution@gmail.com ("SUBJECT ACCOUNT 3"); and

d.  The email account identified as rentpoetfraud@gmail.com ("SUBJECT ACCOUNT 4").

that are within the possession, custody, or control of Google, LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, regardless of where such information is stored, held, or maintained.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

## I. SEARCH PROCEDURES

1.     The warrant will be presented to personnel of Google, LLC (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.     To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.     The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.     With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other

i

sophisticated techniques.  The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   <u>INFORMATION TO BE DISCLOSED BY THE PROVIDER</u>

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, including:

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNTS, including contacts with support services and records of actions taken.

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)   the SUBJECT ACCOUNT.

ii.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

iii. All other records of communications and messages of any kind made or received by the user, including all Chat, Duo, Hangouts, Meet, Messages, and private messages, in any format and however initially transmitted, including stored, deleted, and draft messages, and including attachments and links, the history of any kind of messages or communications, and audio and video calling history, and where such records exist, the identity of any other user or account with which the SUBJECT ACCOUNT was connected;

iv.  All records (including content records and the stored application data) pertaining to any Google service associated with the SUBJECT ACCOUNT, including services such as Gmail, Android, Google Play and Android Market (including payment information), Google Groups, Google Dashboard, Google Code, use of Google Chrome or Google Chrome Sync (including the content of the data that is synced between different devices and the identity of such devices), Google Reader, Google Translate or Google Translator Toolkit, Google Talk, Google Calendar, Google Docs, Google Drive, Google News, Google Reader, Google

Services, Google+, Has Google Profile, Has Plusone, Google Photos (formerly Picasa), YouTube, Google Tasks, iGoogle, Web History, Google Talk, Google Voice, and Hangouts, **including all associated logs and change history**;

      v.   All records (including content records and the stored application data) associated with the SUBJECT ACCOUNT pertaining Internet search and browsing history, and application usage history, including Web & App Activity, Voice & Audio History, Google Assistant, and Google Home, including: search queries and clicks, browsing history, bookmarks, passwords, autofill information, alerts, subscriptions, and other automated searches;

      vi.  All Google Voice and Google Talk records (including content records and the stored application data) associated with the SUBJECT ACCOUNT, including forwarding and other associated telephone numbers, connection records, call detail records, SMS and MMS messages, voicemails, and user settings, including all deleted messages.

      vii. All records (including content records and the stored application data) associated with the SUBJECT ACCOUNT in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other Google service (such as Google Classroom

or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

## III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11. For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a. All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 875(c) (threat by interstate communication), 2261A(2) (stalking), and 922(g) (prohibited person with a firearm) (the "SUBJECT OFFENSES"), namely:

i. Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii. Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii. Any messages, records, documents, or material that relates to sending threatening messages;

iv. Any messages, records, documents, or material that relates to the possession, acquisition, or attempted acquisition of a firearm;

v. Any messages, records, documents, or material that identify the user(s) of the SUBJECT ACCOUNTS.

vi. Any files, records, or messages that pertain to accounts with any Internet Service Provider or any Electronic Service PROVIDER.

vii. Any passwords, encryption keys, and other access devices that may be necessary to access folders and files in the SUBJECT ACCOUNTS.

viii.   Information relating to co-conspirators engaged in the SUBJECT OFFENSES, which could include information relating to their identities, whereabouts, communications, and methods of contact and communication.

b.   All records and information described above in Section II.10.b.

IV.   **PROVIDER PROCEDURES**

12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

> Jacob Tomes
> 11000 Wilshire Boulevard Suite 1700
> Los Angeles, CA 90024
> Phone: 571-660-0297
> Email: jrtomes@fbi.gov

13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.   IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the

United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

**AFFIDAVIT**

I, JACOB TOMES, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation (FBI) and have been so employed since February 2023.  I am currently assigned to a criminal threats squad located at the Joint Regional Intelligence Center in Norwalk, California (CA) 90650. While assigned to the criminal threats squad, I have investigated crimes such as threats, stalking, harassment, and school shooting threats. I have developed expertise in assessing threats to determine their validity, seriousness, and imminence.

2.   I have been employed as a sworn law enforcement officer for five years, serving with the City of Fullerton Police Department (CA), City of Menifee Police Department (CA), and the Federal Bureau of Investigation.  As a sworn Police Officer and FBI Special Agent, I have investigated a wide range of crimes to include narcotics trafficking, kidnappings, firearms violations, gang crimes, court order violations, sex crimes, elder and child abuse, homicides, robberies, attempted murder, and others.

3.   I have lead numerous investigations in which I have prepared search warrant affidavits and successfully lead the authorized searches at various locations.

4.   I make this affidavit in support of an application for a warrant for information associated with the following email accounts (collectively, the "SUBJECT ACCOUNTS") that are stored

at premises controlled by Google, LLC (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, as further described in Attachment A:[1]

     a.    The email account identified as jlipman52@gmail.com ("SUBJECT ACCOUNT 1");

     b.    The email account identified as ocjudgesarecapitalistliars@gmail.com ("SUBJECT ACCOUNT 2");

     c.    The email account identified as laceyviolatesconstitution@gmail.com ("SUBJECT ACCOUNT 3"); and

     d.    The email account identified as rentpoetfraud@gmail.com ("SUBJECT ACCOUNT 4" and collectively the "SUBJECT ACCOUNTS").

5. The information to be searched is described in Attachment B.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a),

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

6.    As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. §§ 875(c) (threat by interstate communication), 2261A (stalking), and 922(g) (prohibited person with a firearm) (the "Subject Offenses").

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

---

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  SUMMARY OF PROBABLE CAUSE

8.   In May 2022, Jonathan LIPMAN ("LIPMAN"), a Los Angeles resident, posted threatening content from an account under his name on a Facebook page belonging to the Lacey Township Police Department (LTPD) in the State of New Jersey.  As a result, LTPD filed for a temporary extreme risk protective order to prevent LIPMAN from possessing firearms.  On July 8, 2022, Lacey Township Municipal Court Judge Benjamin Mabie signed the temporary order.  The following day, a Los Angeles Police Department officer served the order on LIPMAN in California.  On January 31, 2023, New Jersey Superior Court Judge Kim Marie Rahill signed a Final Extreme Risk Protective Order, prohibiting LIPMAN from possessing firearms.

9.   Beginning on or around February 1, 2023, LIPMAN started sending hundreds of threatening emails to New Jersey public officials, including Lacey Municipal Judge Mabie, Oceanport Municipal Judge Patti, Lacey Township Official Bruce Padilla, Ocean Superior Court Judge Rahill, and several others.  As described below, in many of these emails, LIPMAN wrote in

explicit detail how LIPMAN hoped the aforementioned public officials will die painful, gruesome, and violent deaths.

10.   Additionally, on February 1, 2023, LIPMAN emailed Judge Rahill a picture of what appeared to be a lever action shotgun.

11.   On July 13, 2023, Los Angeles Police Department ("LAPD") Detective Cao made contact with LIPMAN at his residence and spoke to him regarding the threatening emails he had been sending.   LIPMAN told Detective Cao that he would continue to send threatening emails. On July 23, 2023, LIPMAN sent Judge Rahill 11 threatening emails explaining how he would like to see her die. As of September 6, 2023, LIPMAN has sent approximately 400 emails to the aforementioned victims, a majority of which have been threatening, violent, or harassing in nature.

12.   As set forth below, the SUBJECT ACCOUNTS have been identified as email accounts that were used to send the harassing and threatening messages.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

13.   The information below is based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation.

14.   On July 7, 2023, I was assigned a criminal threats and stalking case which had been reported to the FBI by the New Jersey Court and Judicial Security Unit ("New Jersey Court Security").   I spoke to and received documents from several individuals at the New Jersey Court Security including Chief Robin Morante, Judicial Risk Assessment Manager James Pisano,

and Security Programs Coordinator Katherine Grzeda.  I reviewed a report authored by New Jersey State Police Department (NJSP) Detective D. Harrison who had been investigating LIPMAN for the same series of ongoing criminal threats and stalking conducted by LIPMAN against several public officials in New Jersey.

15. I know from my conversations with New Jersey Court Security personnel and review of documents provided by NJSP and New Jersey Court Security that around May 3, 2022, a user with the name "Jonathan Lipman" posted threatening content on the Facebook page belonging to the Lacey Township Police Department (LTPD) in the State of New Jersey. In these Facebook posts, Lipman made statements such as "You and your officers an their families will regret your continued cover up", "Gary quinn doesn't belong on a plaque. He belongs on someones mantle", "They and their families lives don't matter. The world would be better off it officers like Dallas Gant were removed from the planet," and "Their children will pay." I know based on my review of the Extreme Risk Protective Order that LTPD subsequently filed for a Temporary Extreme Risk Protective Order in the State of New Jersey, which was signed by Lacey Township Municipal Court Judge Benjamin Mabie on July 8, 2022. The protective order required LIPMAN to surrender any firearms and ammunition in his possession and prohibited LIPMAN from purchasing any additional firearms.

16. I know according to New Jersey Court Security personnel, that during court proceedings for the Extreme Risk Protective Order (the "New Jersey Protective Order"), LIPMAN was

6

residing in Los Angeles, California and was attending online
virtual court hearings. LIPMAN had previously been a resident of
The State of New Jersey.

17. I know based on my conversations with New Jersey Court
Security and Los Angeles Police Department officers that once
the temporary order was granted, New Jersey Court Security sent
service documents to LAPD.  LAPD Officer T. Nguyen served LIPMAN
with the New Jersey Protective Order on July 9, 2022.  A search
for firearms was not conducted and LIPMAN did not surrender any
firearms to LAPD at that time.

18. A California DMV records check revealed LIPMAN has a
2014 Hyundai with a license plate number of 7FZF800 registered
to him with an address of 1247 Amherst Avenue, Apartment 1, Los
Angeles, CA 90025.

19. I know based on my review of the Final Extreme Risk
Protective order that the Final Extreme Risk Protective Order
was granted and signed by Superior Court Judge Kim Marie Rahill
on January 31, 2023. This Final Extreme Risk Protective Order
was granted to supersede and replace the previous Temporary
Extreme Risk Protective Order. As of the date of this filing,
the restraining order is current and will remain in place
indefinitely until or unless a petition is filed by LIPMAN to
vacate the order. I know based upon email correspondence between
LIPMAN and Erin Caulfield that LIPMAN received notice of his

court hearings and was provided with instructions on how to participate in the virtual court hearings.

20. I know based on my conversations with New Jersey Court Security personnel and review of emails that after the court proceedings for the protective order, LIPMAN began sending an extensive series of emails to several public officials, court employees, judges, and LTPD police officers. LIPMAN emailed threatening messages directly to or mentioned the following individuals in the emails: Ocean Superior Court Judge Kim Marie Rahill, Lacey Municipal Judge Benjamin Mabie, Ocean County Commissioner Gary Quinn, Attorney Bruce Padula, Probation Officer Erin Caulfield, Municipal Court Judge John Patti, Oceanport Police Chief Michael Kelly, LTPD Police Officer C. Kenney, LTPD Police Officer D. Gant, and other miscellaneous individuals. I was provided with copies of approximately 400 of these emails by New Jersey Court Security and have reviewed them. LIPMAN sent these emails from several email accounts to include SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, SUBJECT ACCOUNT 3, SUBJECT ACCOUNT 4, AND SUBJECT ACCOUNT 5. In many of these emails, LIPMAN either included the signature "Jonathan Lipman" in the body of the emails, mentioned "Jonathan Lipman" by name, responded to official court correspondence, or in one instance sent a photograph of himself in the email, indicating that the email addresses belong to and / or were operated by LIPMAN.

Specifically, LIPMAN emailed Judge Rahill approximately 6 times on February 4, 2023, approximately 3 times on March 28, 2023, approximately 11 times on July 23, 2023, and on several other dates. LIPMAN also emailed Judge Patti, Chief Kelly, Bruce Padula, and other recipients approximately 96 times on July 25, 2023, and Officers Kenny and Gant approximately 32 times on July 9 and 10 of 2023. LIPMAN sent hundreds of other emails to these recipients from approximately February 1, 2023, through September 6, 2023.  LIPMAN's initial emails contained explanations as to why LIPMAN felt his constitutional rights had been violated by the aforementioned individuals during his ERPO court proceedings. However, the emails quickly turned threatening in nature and included graphic and violent descriptions of how LIPMAN prayed, desired, wished, and fantasized for the aforementioned individuals to die.

21. Around February 1, 2023, LIPMAN sent an email to Judge Kimarie Rahill from the email address "jiplman52@gmail.com" (i.e., SUBJECT ACCOUNT 1) titled "Is a photo illegal?"  The body of the email only included the text " ;) " (winking emoticon) and a picture of a lever action shotgun.[3]  The following is the

---

[3] Based on my training and experience, the firearm in the photograph appeared to be real with no features to indicate that the firearm was fake; however, it is impossible to determine without physically examining the firearm.  A reverse image search of the shotgun was conducted by SA Tomes and received negative results indicating LIPMAN had likely taken the photograph of the shotgun himself.

photograph that was sent:



22. On February 1, 2023, according to New Jersey Court
Security, LIPMAN left a voice message for Judge Rahill on Erin
Caulfield's telephone in which LIPMAN stated, "it's a shame
there are kids that get shot up in schools instead of you
people."

23. I know from a report authored by NJSP Detective
Harrison that around February 1, 2023, Detective Harrison
interviewed LIPMAN via LIPMAN's telephone. Detective Harrison
indicated in his report that LIPMAN'S phone number was (609)
618-2597. Detective Harrison asked him about the picture of the
shotgun LIPMAN had emailed to Judge Rahill.  LIPMAN told
Detective Harrison that he was exercising his first amendment
rights, that firearm seen in the image was just a "prop", and
that LIPMAN does not own firearms. LIPMAN sent Detective
Harrison a copy of LIPMAN's California Driver's License and
confirmed his identity.

24. According to New Jersey Court Security reports, around
February 23, 2023, Judge Rahill's neighbor; Edward O'Neill,
received a voicemail from LIPMAN using telephone number (609)
618-2597 stating "I don't know if you are Kimarie Rahill's
neighbor but if you are you are in danger. She has violated my
rights and will do the same to you. She also does not believe in
the constitution, which is also a danger". LIPMAN has no known
association with O'Neil. New Jersey Court Security expressed
concern that LIPMAN appeared to be researching the home address
of Judge Rahill and her neighbor O'Neill, and subsequently
making unsolicited phone calls to O'Neill. According to NJSP
reports, the telephone number (609) 618-2597 was verified to be
LIPMAN'S telephone number based upon NJSP's prior contact

telephonic contact with LIPMAN.

25. Around February 27, 2023, Carol Smith; the court administrator for Judge Patti, along with James Butler and Bruce Padula, all received an email from LIPMAN sent from the email address jlipman52@gmail.com (SUBJECT ACCOUNT 1) containing a photograph of LIPMAN with a white rope noose around his neck. In the photograph, LIPMAN is seen holding and iPhone. The email contained the signature "Jonathan Lipman".

26. Around March 28, 2023, LIPMAN sent Judge Rahill three emails from the email address jlipman52@gmail.com (SUBJECT ACCOUNT 1). In one of the emails, LIPMAN wrote "But as you struggle to breath or what ever consequence your selfish little life befalls you body and betrays your existence, you will remember me. You concerns about where you are headed are warranted. Some call it hell". The email was signed "Jonathan Lipman".

27. Around April 3, 2023, and April 5, 2023 LIPMAN sent approximately 8 emails from the email address jlipman52@gmail.com (SUBJECT ACCOUNT 1) to various recipients including Judge Rahill, Chief Kelly, Judge Patti, and Bruce Padula. In one email sent to Chief Kelly, Bruce Padula, John Patti, and others, LIPMAN wrote "just saying the world would be better off if you and your children were kidnapped, imprisoned, and then put in a gas chamber". Several of these emails were

signed "Jonathan Lipman" in the body of the emails.

28. Around April 7, 2023, an email titled "Bigoted Judges the world would be better off being removed from existence" was sent to Judge Rahill and several other recipients from the email address ocjudgesarecapitalistliars@gmail.com (SUBJECT ACCOUNT 2). The author refers to Jonathan Lipman several times in the body of the email and writes in the same style as LIPMAN'S other emails. For these reasons, it is believed LIPMAN is the author of this email. In the email, the author writes "We are watching you judges" and "You will regret it.".

29. Around June 7, 2023 and June 30, 2023, LIPMAN sent approximately 17 emails from the email address jlipman52@gmail.com (SUBJECT ACCOUNT 1) to various recipients including Bruce Padula, Judge Patti, and Chief Kelly. In one email sent on June 30, 2023, LIPMAN wrote "The world would be better off if Bruce died a painful death as his wife and children helplessly watched, I pray his blood is splattered all over his family so they can pay for his sins too." and "Michael Kelly, I pray he is ran over in a traffic stop. The world would be better off if chief Michael Kelly became one with the pavement like a crushed bug". Several of these emails were signed "Jonathan Lipman" in the body of the emails.

30. Around June 30, 2023 LIPMAN sent an email to Judge Patti and other officials using the email address

jlipman52@gmail.com stating "Most of all though, the world would be better off if John Patti was executed French Revolution style and his head was passed around for people to fuck with. Just to make a demonstration of what happens to people who trample on civil right."

31. Around July 9, 2023, and July 10, 2023, LIPMAN sent numerous emails from "jlipman52@gmail.com" (SUBJECT ACCOUNT 1) signed "Jonathan Lipman" to LTPD Officers C. Kenney and D. Gant. In these emails LIPMAN made statements such as "Gary wuinns head will be on my mantle. It was always going to be a bobblehead. It will be on others mantles too.", "This time I made threats though. Which means as a California resident I should be charged with the federal crime of making terroristic threats", and "beheadings, cancer, bullets to the head. Im not god. Its not my decision. But whatever way that removes these terrible government employees who would make better corpses than people i pray god takes.". Several of these emails were signed "Jonathan Lipman" in the body of the emails.

32. Around July 13, 2023, LAPD Detective Cao made contact with LIPMAN at his residence located at 1247 Amherst Avenue, Apartment 1, Los Angeles, CA 90025 (The "Subject Premises"). The address of 1247 Amherst Avenue, Apartment 1, Los Angeles, CA 90025 is listed as Lipman's address on his California Driver's License.  Detective Cao spoke to LIPMAN regarding the emails

being sent to New Jersey public officials. LIPMAN stated he does not want to hurt anyone. LIPMAN stated he was in control but was trying hard to "not cross over the line". Detective Cao asked LIPMAN if he would stop sending emails to public officials in New Jersey, to which LIPMAN stated if he was not going to be placed under arrest, he would continue to send emails.

33. Around July 23, 2023 Judge Rahill received about 11 emails sent from "laceyviolatesconstitution@gmail.com" (SUBJECT ACCOUNT 3). The emails appeared to have been sent by LIPMAN based upon the recipient, writing style, and nature of the emails. In the emails, the author wrote in explicit detail about how he prays and hopes Judge Rahill will die. In one email titled "knives over guns", the author stated "guns are too quick now I could be talking about in a movie or a tv show. I could be talking about in a book. I could be talking about a radio play". In another email to Judge Rahill, the author wrote "Let us imagine Alexander Burr, Alexander Hamilton, Patrick Henry, James Madison, thomas paine, and John Jay, all gun owners who called for the execution of tyrants like Kimarie Rahill, breaking into kimarie Rahills house in the middle of the night and removing her at gun point.", "lets imagine kimarie rahill being dragged to the gallows.", and "Then Kimarie Rahill is beheaded. Her head is placed on a stick. Her limbs and body parts sold as souvenirs.". The author then made the statement, "Now of course

this is just a fantasy. No crime has ever been committed.
Nothing has been threatened. No threats had even been
instituted".

34. Around July 25, 2023, a series of emails was sent to
Bruce Padula, Chief Kelly, Judge Patti, and other recipients
from the email address rentpoetfraud@gmail.com_(SUBJECT ACCOUNT
4). In one email, the author writes "You will never prove
Jonathan Lipman wrote anything though." On the same day, the
author sent several violent and threatening emails including one
email titled, "Bruce Padula is covering a knife attack on a
jewish person". In the body of this email, the author writes
"lets imagine the knife cutting deep as he begs and pleads to
live and the person supposed to protect him does nothing.".  In
another email sent from rentpoetfraud@gmail.com (SUBJECT ACCOUNT
4) on the same day the author writes "but how would you all look
if jonathan lipman snapped and killed someone in a 10 years
because they couldn't handle Monmouth, ocean and new jersey
governments persecuting them for seeking their first amendment
right…".

35. Around August 5, 2023, an email was sent from the email
address rentpoetfraud@gmail.com (SUBJECT ACCOUNT 4) to Judge
Mabie, Judge Rahill, Officer Kenny, and various other recipients
titled "A Violent Terroristic Threat". In the email, the author
states "he is more likely to come to ocean county than Jonathan

lipman… make sure to remove his right to own weapons. Don't just limit it to guns".

36. Around August 9, 2023, an email was sent from the email address rentpoetfraud@gmail.com (SUBJECT ACCOUNT 4) to Judge Mabie, Judge Rahill, Judge Patti, Chief Kelly, in which the author states "Jonathan lipman has a right to die as the governments martyr just like jesus". The author of all these emails sent from rentpoetfraud@gmail.com (SUBJECT ACCOUNT 4) wrote in the same style as other emails sent by LIPMAN, sent the emails to the same recipients, and mentioned LIPMAN by name in the body of the emails. For these reasons, it is believed the author of the emails sent from rentpoetfraud@gmail.com (SUBJECT ACCOUNT 4) is LIPMAN himself.

37. Around August 24, 2023, Judge Patti received about 28 voicemails from the telephone number (609) 618-2597, which according to NJSP belongs to LIPMAN. New Jersey Court Security provided me with recordings of the voicemails, and I reviewed them. In the voicemails, LIPMAN states repeatedly that "John Patti is a worthless bigot" for various reasons. In several voicemails LIPMAN states "John Patti is a worthless bigot the world would be better off without".  LIPMAN also explains in several voicemails that he does not have a right to directly threaten to harm Judge Patti, but he does have a right to say that he hopes and wishes death upon Judge Patti.

38. As of September 6, 2023, New Jersey Court Security provided me with, and I have reviewed approximately 400 emails that LIPMAN sent to public officials between February 1, 2023 and September 6, 2023 using several email addresses including the SUBJECT ACCOUNTS.  A majority of these emails are threatening, violent, or harassing in nature. I have also reviewed numerous reports detailing the instances when LIPMAN called New Jersey public officials and their associates. In a majority of these emails and telephone calls, LIPMAN explains in varying levels of detail how he prays, desires, and wishes for these New Jersey public officials to die gruesome deaths. LIPMAN often qualifies his statements by writing that he is not violent and that these are not actually threats but rather fantasies.

39. New Jersey Court Security reports stated they have received emails from LIPMAN from the following email addresses: ocjudgesarecapitalistliars@gmail.com (SUBJECT ACCOUNT 2), jLIPMAN52@gmail.com (SUBJECT ACCOUNT 1), rentpoetfraud@gmail.com (SUBJECT ACCOUNT 4), jonathanlipmannumber2001@gmail.com, and laceyviolatesconstitution@gmail.com (SUBJECT ACCOUNT 3) in what appears to be an attempt by LIPMAN to avoid public officials from blocking his emails and to conceal his identity. New Jersey Court Security Security Programs Coordinator Katherine Grzeda stated as of September 6, 2023, LIPMAN continues to send

threatening emails to public officials on a regular basis. SA
Tomes reviewed and confirmed LIPMAN has continued to send emails
to New Jersey public officials as of September 6, 2023.

40.  Due to the extensive volume and frequency of LIPMAN's
correspondence to various New Jersey public officials, this
statement of probable cause does not set forth each and
every fact that I or others have learned during the course
of this investigation, but rather, only the facts necessary to
establish probable cause that the aforementioned criminal
statutes have been violated.

### IV.   SERVICES PROVIDED BY GOOGLE

41.  Based on a review of information provided by Google
regarding its services, information provided by other law
enforcement officers, and my training and experience, I am aware
of the information contained in this section of the affidavit
regarding Google.

42.  Google provides a variety of online services, many
through Google Accounts, including email, document storage,
mobile operating systems, translation services, software coding
tools, malware analysis, social media accounts, applications
development tools, video and photograph sharing and storage, web
feed management tools, personalized home pages, news aggregation
tools, a Google Account "dashboard" tool, an online retail
storefront offering applications for free and for sale, website
analytic tools, calendars, web browsers, mapping tools, location
tracking tools, and telephone and voicemail transcription to the
public.

43.   Google Calendar (Google's appointment book service)
allows users to create events or RSVP to events created by
others.  A single Google Account can set up multiple calendars.
A calendar can be shared with other Google Accounts by the user
or made public so anyone can access it.  Users also have the
option to sync their device calendar so it is stored in Google
Calendar.

44.   Google also offers numerous services which enhance the
user's Internet experience, including Google Dashboard, Google
Reader, Google News, and Google Groups.  Google News and the
now-discontinued Google Reader are website feed aggregators that
allowed a user to view website articles and news in one
centralized location.  Google Groups are email groups whereby
one person can send an email to an email address that serves as
the "group," and the message or email is either or both posted
to a centralized location and/or sent to everyone who is
currently subscribed to the group via email; each group is
generally set up using a Google account.

45.   Google also offers a service called Google Hangouts,
which allows Google users to communicate by means of video
calls, phone or audio calls, or written messages.

46.   Google also offers its own web browser -- Google
Chrome -- which can be used instead of other web browsers such
as Microsoft Internet Explorer or Mozilla Firefox.  Google
Chrome retains a record of a user's browsing history and allows
users to save favorite sites as bookmarks for easy access.  If a
user is logged into their Google Account on Chrome and has the

appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.  Users who have a Google Account can use Google Chrome on multiple devices and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating systems).  Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes.

47.  Users can obtain a Google Account by registering with Google.  During the registration process, Google generally ask subscribers to provide certain personal identifying information when registering.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Google may also maintain a record of changes that are made to the information provided in subscriber records, such as to any other email addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

48.   Evidence of who it is that a user of an account has
contacted and for what purpose can also reside in the
information likely stored on a SUBJECT ACCOUNT at Google.  For
example, photographs can be stored not only as attachments to
emails, but they can be linked to a particular contact stored in
connection with an email account, they can be stored in
connection with a particular "friend" or event on a Google+
account, or they can be stored in a Google Photos (formerly
Picasa) web album.  Albums can be compiled for a particular trip
or occasion, documenting who was present, when it took place,
and where it was -- for example by recovering location
information that is sometimes stored in metadata, or what is
referred to as "EXIF data" on digital photographs.  Likewise,
personal videos can be uploaded to or downloaded from video
services such as Google's YouTube.  All of this data can assist
in identifying the true identity of the account user and persons
with whom the user of the account has been in contact.

49.   Aside from photos, the discontinued Google+, Google
Plusone, and iGoogle services were social networking services
similar to Facebook.  Data residing on Google+, Google Plusone,
and iGoogle accounts is likely to provide information regarding
the true identity of the person(s) using a SUBJECT ACCOUNTS, the
identities of persons with whom the user of a SUBJECT ACCOUNTS
has been in contact, the nature of those contacts, and whether
any such contacts were related to the subject matter of the
investigation described above.  Furthermore, a user's history
that relates to web browsing, web searches, and certain activity

related to Google services or applications (or "apps") are
stored in an account's Google History, or Google Web & App
Activity.

50.  In addition to storing photographs, calendars, and
other evidence related to social media, a subscriber can also
sign up for other services at Google, such as Google Drive and
Google Keep, which allow users to store any kind of documents.
Google Drive is a cloud storage service that allows users can
store an unlimited number of documents created by Google
applications such as Google Docs, Google Sheets, Google Forms,
and Google Slides. Users can also upload files to Google Drive,
including photos, videos, PDFs, and text documents, until they
hit the storage limit.  Users can set up their personal devices
to automatically back up files to Google Drive.  Google Drive
allows users to share their stored files and documents with up
to 100 people and grant those with access the ability to edit or
comment.  Google maintains records of changes to documents
edited in Google applications.  Google Keep is a cloud-based
notetaking service that lets users take notes and share them
with other Google users to view, edit, or comment.

51.  A subscriber can also store with Google files in
addition to emails or other messages, such as address books,
contact or buddy lists, groups, social network links, calendar
data, pictures or videos (other than ones attached to emails),
notes, and other files, on servers maintained and/or owned by
the PROVIDER.  In my training and experience, evidence of who
was using an account may be found in such information.

52.   Providers like Google typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account, and other log files that reflect usage of the account.  In addition, email and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

53.   Google also collects and retains data about the location from which Google Account services are accessed on any mobile device.  According to Google, this location data may be associated with the Google Account signed-in or registered to the device if Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking.  The data retained includes precision location data, like latitude and longitude coordinates derived from GPS.

54.   In addition, Google Maps provides a mapping tool that allows users to search for addresses or points of interest, save locations (such as their home and work locations), create custom

maps, make changes and edits to public places, "star" locations, and create private labels for locations.  Users can share their real-time location with others through Google Maps by using the Location Sharing feature.  Users could find and plan an itinerary using the discontinued Google Trips, whose functionality is now part of Google Travel.  Google Location History provides Global Positioning System (GPS) location information.  All of these services can be used to identify where an individual is and has been physically located.  Google also in some instances maintains records of the nearby wireless or "Wi-Fi" access points (that can be used to connect to the Internet) or the cellular towers connected to a device that is accessing a Google Account.

55.  Google offers services which interpret and translate text, including Google Translate (which allow users to paste text in one language that will be translated into another) and Google Translator Toolkit (which includes more functionality and collaboration), which can translate text in over 100 languages.  The translation service is Internet-based, so it can be used by the user of the account to translate emails received as well as websites visited.

56.  Over the last several years, Google has developed a number of mobile telephone and voicemail technologies, including the development of the Android mobile operating system, Android Market, Google Voice, and the discontinued Google Talk.  The Android operating system is used on the majority of the world's touch-screen mobile devices and smartphones, and facilitates the

downloading and running of games and applications, sending of
text and voice messages, connecting to and searching the
Internet, and providing of GPS and location services, camera
services for the taking of photographs and videos (including
video calling), clock and calendar services, and email services,
and storing of contact lists and documents.  The Google Play
service provides the virtual storefront at which applications
can be downloaded and updated.  I know from experience that
Android applications including these are generally downloaded
from the Android Market and Google Play services.  Through
Google Voice, users can be assigned a telephone number that can
be used to make, record, and forward phone calls and send,
receive, store, and forward SMS and MMS messages from a web
browser, mobile phone, or landline.  Google Voice also includes
a voicemail service.  Google Talk was an instant messaging
service that provided both text and voice communication.

57.  Google also uses "unique application numbers," which
Google uses to record information such as the operating system
type and the application version number used to access Google by
a particular device.  Google maintains these unique application
numbers to track and collect information related to a particular
device accessing Google services, which is recognized when
updating Google services or software on a device using a Google
Account.

58.  Google can also track users across various devices,
services, and "apps."  One way that it does so is by assigning a
Google Accounts and ID Administration ("GAIA") ID.  Google is

26

therefore able to determine when activities are connected to that GAIA ID.

59.  Google also now offers users the ability to exercise certain control over email messages, for example by allowing users to send expiring messages, to require a recipient to insert a password to open a message, to retract access to a sent message, or to control whether a recipient can forward a message.

60.  Depending on whether a user of a Google Account implemented Google's two-factor authentication system (which can require the user to enter both a username and password and a code sent to one's cell phone), Google may also have authentication logs of when the user successfully authenticated or identified him- or herself when logging into an account. Similarly, for certain mobile devices, a password for the specific "app" installed on the mobile device may be generated and used to maintain access.

61.  In some cases, users may communicate directly with Google about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Providers like Google typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

62.  Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any

person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in (1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; (5) otherwise seriously jeopardizing the investigation.

**V.   <u>CONCLUSION</u>**

63.  Based on the foregoing, I request that the Court issue the requested warrant.  The government will execute this warrant by serving the warrant on the PROVIDER.  Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
September, 2023.


_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE